MONTIE J. MARVIN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; TREVIS L. RORIE AND SHERILYN RORIE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Marvin v. Commissioner
Docket Nos. 6695-77, 6701-77.
United States Tax Court
T.C. Memo 1980-509; 1980 Tax Ct. Memo LEXIS 72; 41 T.C.M. (CCH) 369; T.C.M. (RIA) 80509; November 19, 1980, Filed Ralph Nathanson, for the petitioners. George MacVogelei and Catherine Wong, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: On May 7, 1979, the cases at Docket Nos. 6692-77 through 6703-77 were *73 called from the calendar for the trial session at San Francisco, at which time, pursuant to the parties' oral motions, the cases at Docket Nos. 6695-77 and 6701-77 were ordered to be consolidated for trial, briefing, and opinion. Jurisdiction of the cases at the remaining docket numbers was retained by this Division of the Court. The two consolidated cases were tried May 11, 1979. The Commissioner determined deficiencies in and additions to the Federal income tax of petitioners as follows: Additios to Tax
Deficiencies
Sec. 6653(a), I.R.C. 1954 [1]
Petitioner
1972
1973
1972
1973
Montie J. Marvin
$886
$805
$44
$40
Trevis L. & Sherilyn
Rorie
937
837
47
42
After concessions, we must determine: (1) whether petitioners failed to report any portion of their tip income for 1972 and 1973, and, if so, the amount of such portion; (2) whether petitioners are entitled to deduct as employee business expenses the value of meals furnished them by their employer in 1972 even though such value was excluded from their gross incomes for that taxable year; and (3) whether petitioners are liable for the negligence penalty imposed by section *74 6653(a). FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner Montie Marvin (hereinafter Montie) resided in San Leandro, California, when she filed her petition herein. She timely filed individual Federal income tax returns with the Internal Revenue Service Center in Fresno, California, for her taxable years 1972 and 1973. Petitioners Trevis and Sherilyn Rorie resided in Alameda, California, at the time they filed their petition herein. They timely filed joint Federal income tax returns for their taxable years 1972 and 1973 with the Internal Revenue Service Center at Fresno, California. During 1972 and 1973, Montie and Petitioner Sherilyn Rorie (hereinafter Sherilyn) were employed as dining room waitresses at the Elegant Farmer Restaurant in Jack London Square, Oakland, California. Jack London Square is one of Oakland's tourist attractions, located on San Francisco Bay, and contains a lodge, several restaurants, specialty shops, and a marina. The dining area of the Elegant Farmer is divided into the main dining room, the Gold Room, the *75 Wells Fargo Room, and the Fireside Room. The Elegant Farmer also contains a cocktail lounge and a banquet room which is used for regular dining only when it is vacant and there is an overflow of business from the main dining area. The Elegant Farmer features prime rib, steaks, sea food, as well as buffalo steak, which is its specialty. During 1972 and 1973, the prices of lunch ranged from approximately $2.50 to $5.00 and those of dinner from $5.00 to $8.75, exclusive of beverage and dessert. In spite of its name, and Elegant Farmer was certainly not an opulent, hautecuisine type of dining establishment on the order of San Francisco's finest restaurants. In the words of some of its long-time employees it was a "glorified coffee shop" "without the table service that you expect from a classy house, such as table cloths," a "volume house * * * probably the most popular in Oakland, at the time." The Elegant Farmer served many large parties of office workers and professional athletes who frequently demanded separate checks and were notoriously low tippers. Generally speaking, the waitresses at the restaurant had to write a large number of separate checks, as contrasted to *76 waitresses at other area restaurants, and uniformly stated that the tipping rates were much lower of this type of check. The restaurant also served a lot of families, who generally could afford to leave only low tips. Also, the Elegant Farmer had a substantial number of "walk-outs," that is, people who left without paying their check. The waitresses were expected to keep an eye on the patrons in order to prevent this, and had to pay the check themselves when it occurred. During 1972 and 1973, the waitresses at the Elegant Farmer had to pay certain amounts out of their tips before taking them home. Each had to tip her busboy anywhere from one to four dollars per day to insure good performance. The waitresses also tipped the bartenders at the "service bar" whenever the patron would order alcoholic beverages. This tip amounted to about one dollar per day.In addition, when a customer would order drinks in the cocktail lounge and then dine, often he or she would simply have the cocktail lounge tab transferred onto the lunch or dinner check. The dining room waitress would then pay over to the cocktail waitress her proportionate share of whatever tip was left. For each hour that *77 a waitress worked, $.45 was withheld from her paycheck and divided among the non-waitress restaurant personnel. This amount was in addition to what the waitress paid the busboy out of her tips and did not come out of her gross tip receipts. Prior to turning in their time cards at the close of each two-week pay period in 1972 and 1973, the waitresses were required to indicate on the back the tips (net of busboy and bartender tips and payments to cocktail waitresses) they had received during that time period. The amounts which Montie and Sherilyn entered were merely estimates of their net tip income; neither kept records of the actual amount of net tips received by them each day. The Elegant Farmer used these estimates to determine the amount of net tip income to be reported on the waitresses W-2 Forms. The following table shows for 1972 and 1973 the net tip income included as employee compensation on the petitioners' W-2 Forms and in their gross incomes, total hours worked at the Elegant Farmer, the value of meals furnished petitioners by the Elegant Farmer as indicated on their W-2 Forms but not included in their gross incomes, and the amounts withheld from their paychecks for *78 other restaurant personnel at $.45 per hour and deducted by them as employee business expenses: Marvin
Rorie
Item
1972
1973
1972
1973
Net tips included on W-2 & in
gross income
$3,622
$3,625
$1,211
$1,732
Hours worked
1941.5
1913
1295
1301.5
Value of meals furnished by
employer & excluded from
gross income
$ 398
$ 446
$ 263
$ 258
Amounts withheld from regular
pay for distribution to
non-waitress personnel &
deducted as employee
business expense
$ 900
$ 900
$ 765
$ 865
For their taxable years 1972, the Rories and Montie deducted, as employee business expense, the value of the meals furnished that year even though such value was not included in their gross incomes. The following table shows relevant data pertaining to the operation of the Elegant Farmer: Item
1972
1973
(1) Total food sales in Banquet
& Dining Rooms
$2,053,465
$2,109,058
(2) Total liquor & wine sales
812,372
835,248
(3) Percentage of total sales of
restaurant which were charged
29.84%
31.81%
(4) Total Dining & Banquet Room
sales charged for May &
October which included a
charge tip
129,262
138,800
(5) Amount of gross tips included
in the sales in (4)
15,685
17,251
(6) Gross tips in line (5) as a
percentage of charged sales
in line (4) [2]
12.1%
12.4%
(7) Total hours worked by all
waitresses in Dining &
Banquet Rooms
59,046.5
59,653
(8) Percentage of liquor & wine
sales allocable to Dining &
Banquet Rooms as opposed to
cocktail lounge for a period
of 27 days in 1973
50%
*79 The overall gross tipping rate on cash sales is less than that on charged sales. Net tips (i.e., tips which the waitresses "took home" after *80 tipping the busboys and bartenders and paying cocktail waitresses) averaged about 9 percent of Dining Room and Banquet Room sales during 1972 and 1973. Respondent reconstructed Montie's and the Rories' net tip incomes and adjusted their gross incomes as follows: 1972
1973
Banquet & Dining Room sales
$2,053,434 [2]
$2,109,058
Add: 2k% of liquor & wine
sales: [1]
25% of $812,403 [3]
203,101
25% of $835,248
208,812
TOTAL SALES attributable
to Dining &
Banquet Rooms
$2,256,535
$2,317,870
Less: Tips Included in
Charge
sales [4]
(74,325)
(83,392)
Sales subject to tip
$2,182,210
$2,234,478
Less: 10% for low or
non-tippers
(218,221)
(223,448)
Sales base for tipping rate
$1,963,989
$2,011,030
Sales per waitress hour
worked
(sales base./. total waitress
hours
worked)
$1,963,989 = $33.26 $2,011,030 = $33.71
59,046.50
59,653
*81 Marvin
Rorie
Hours worked
1,941.50
1,295.00
Sales per waitress hour
X $ 33.26
X $ 33.26
TOTAL SALES per waitress
$64,574.29
$43,071.70
Net tipping rate
X 10%
X 10%
Net tip income
$ 6,457.43
$ 4,307.17
Add: Shared tips per tax returns [5]
900.00
765.00
TOTAL tip income as reconstructed
$ 7,357.43
$ 5,072.17
TOTAL tip income reported
(3,622.00)
(1,211.00)
ADJUSTMENT - increase in gross income
$ 3,735.00
$ 3,861.00
Marvin
Rorie
Hours worked
1,913.00
1,301.50
Sales per waitress hour
X $ 33.71
X $ 33.71
TOTAL SALES per waitress
$64,487.23
$43,873.56
Net tipping rate
X 10%
X 10%
Net tip income
$ 6,448.72
$ 4,387.36
Add: Shared tips per tax returns [5]
900.00
865.00
TOTAL tip income as reconstructed
$ 7,348.72
$ 5,252.36
TOTAL tip income reported
(3,622.00) [6]
(1,732.00)
ADJUSTMENT - increase in gross income
$ 3,727.00
$ 3,520.00
*82 In the statutory notices, respondent increased Montie's and the Rories' gross income by the amounts indicated in the table for their 1972 and 1973 taxable years. He also disallowed the deductions taken by petitioners in 1972 for the meals furnished them by the Elegant Farmer, and determined that petitioners were liable for the negligence penalty imposed by section 6653(a). OPINION Issue 1. Tip Income
Tips are includable in gross income. Sec. 61(a)(1). A taxpayer is required to maintain records of his economic transactions sufficient to establish the amount of gross income he must return. Sec. 1.6000-1(a), (b), Income Tax Regs. If a taxpayer fails to keep the required records, or the records kept do not clearly reflect income, respondent may reconstruct the taxpayer's gross income in accordance with such method as in his opinion does clearly reflect income.Sec. 446(b). Respondent's determination is presumptively correct, Welch v. Helvering, 290 U.S. 111 (1933), but the taxpayer is entitled to show if he can that respondent's method is partially or completely erroneous or unreasonable, either theoretically or as applied to the taxpayer's specific situation. *83 Meneguzzo v. Commissioner, 43 T.C. 824, 834-835 (1965). Petitioners contend that they maintained actual records of their net tip incomes. We conclude that they did not. First of all, it is clear that the amounts the waitresses entered on their time cards every two weeks were merely estimates of the net tip incomes they had received during that period. These resulted from mere post-hoc speculation and certainly do not constitute "records" for purposes of section 1.6001-1, Income Tax Regs. Second, we find that Montie's testimony to the effect that she maintained daily records of her net tips is not entitled to belief. Her responses were evasive and contradictory, and the "records" she submitted appeared to have been recently fabricated. Accordingly, respondent was authorized to reconstruct petitioners' net tipping incomes. We consider the method respondent used here reasonable in its broad outlines, but in need of a few adjustments. We feel that the net tipping rate on all sales is less than the 10 percent assumed by respondent. The 12 percent gross tipping rates which he computed were based upon a small group of overall sales: those sales that were charged *84 and that included a charged tip. This amount tends to overstate the gross tipping rate on total sales for two reasons. First, it overstates the rate on charged sales because those charged sales with respect to which only a cash or no tip was left were not (and of course could not be) taken into account. It cannot simply be assumed that cash tips were left in such cases which averaged 12 percent of the sales.Surely in many cases of charged sales no tip at all was left, and the record is replete with testimony that cash tips were substantially less than charged tips. Second, the 12 percent figure overstates the gross tipping rate on total sales for the same reason and because only about 30 percent of the Elegant Farmer's sales were charged. To arrive at the net tipping rate, the gross rate must be adjusted for tips to busboys and bartenders. We conclude that the overall net tipping rate was closer to 9 percent. Further, after determining the petitioners' net tip incomes, respondent added back the amounts withheld from petitioners' regular pay at $.45 per hour to arrive at what he termed "total" tip income.From this he subtracted the tips reported on the waitresses' W-2 Forms *85 to compute the adjustments to income. The amounts withheld from regular pay, however, were never received as "tips" by the waitresses and hence should not be added to net tip income in determining the adjustments. The waitresses did make a separate payment of about $4 per day to the busboys out of their tips, but this was already accounted for in the amounts reported on the W-2 Forms, and has been considered in formulating the 9 percent net tipping rate. Finally, respondent made other questionable adjustments which were in the petitioners' favor. He reduced total sales attributable to the dining and banquet rooms by $74,325 and $83,392 for 1972 and 1973, respectively, but now states on brief that these reductions were erroneous because no charged tips were actually included in computing total sales. He arbitrarily reduced sales subject to tip by 10 percent to account for low or non-tippers, yet these miserly patrons should be and have been considered in determining the net tipping rate. Accordingly we compute the petitioners' understatement of their gross incomes as follows: Step 1. Sales Per Waitress Hour at the Elegant Farmer
1972
1973
Banquet & dining room sales
$2,053,465
$2,109,058
Add: 25% of liquor & wine
sales: 25% of $812,372
203,093
25% of $835,248
208,812
Banquet & dining room sales
subject to tip
$2,256,558
$2,317,870
Divided by total hours
worked by all waitresses
in banquet & dining rooms
./. 59,046.50
./. 59,653.00
SALES PER WAITRESS HOUR
$ 38.22
$ 38.86
*86 Step 2. Reconstruction of Net Tip Income & Computation of Appropriate Increase in Gross Income
Marvin
Rorie
1972
1973
1972
1973
Total hours worked
1,941.50
1,913.00
1,295.00
1,301.50
Sales per waitress hour
X 38.22
X 38.86
X 38.22
X 38.86
Sales per waitress
$74,204.00
$74,339.00
$49,495.00
$50,576.00
Net tipping rate (9%)
X.09
X.09
X.09
X.09
Net tip income as
reconstructed
$ 6,678.00
$ 6,691.00
$ 4,455.00
$ 4,552.00
Less: Net tip income
as reported
(3,622.00)
(3,624.00)
(1,211.00)
(1,732.00)
Increase in income
$ 3,056.00
$ 3,067.00
$ 3,244.00
$ 2,820.00
This somewhat simplified method was approved in Mendelson v. Commissioner, 305 F.2d 519 (7th Cir. 1962), affg. a Memorandum Opinion of this Court, cert. denied 371 U.S. 877 (1962), and we feel that it more closely approximates net tip income under the particular facts of this case. Issue 2. Deductibility of Excluded Value of Furnished Meals
We next decide whether petitioners may deduct for 1972 the value of meals furnished by their employer but excluded from their gross incomes. To clearly state the issue is *87 to resolve it. Income which has been excluded from gross income may not also be deducted. Such treatment would duplicate a tax benefit. Therefore, Montie may not deduct the $398 value of meals furnished her in 1972, and the Rories may not deduct the $263 value of meals furnished Sherilyn in 1972. Issue 3. Negligence
Section 6653(a) provides in pertinent part: (a) If any part of any underpayment * * * of any tax imposed by subtitle A * * * is due to negligence or intentional disregard of rules and regulations * * * there shall be added to the tax an amount equal to 5 percent of the underpayment. The failure to maintain adequate records is negligence. Schroeder v. Commissioner, 40 T.C. 30, 34 (1963); Meneguzzo v. Commissioner, 43 T.C. 824, 836 (1965). Neither Montie nor Sherilyn maintained any records of their net tip incomes and thus part of petitioners' underpayments of tax is due to negligence. Imposition of the penalty is proper although the amount must of course be recomputed in view of our redetermination of petitioners' net tipping income. Decisions will be entered under Rule 155.
Footnotes
1. Although an analysis showed that close to 50 percent of wine and liquor sales were made in the dining areas, respondent reduced this figure by one-half to account for tips shared with cocktail waitresses. In effect, this is an adjustment made to arrive at sales upon which tips were paid to dining room waitresses. ↩
2. The stipulation of facts contains the figures of 13.81 percent and 14.19 percent for 1972 and 1973, respectively, and yet dividing total charged tips into total charged sales for these 2 months in each year yields the figures listed in the table. We suspect that the higher figures were arrived at by calculating the tip percentage on each sale and then averaging these percentages. This is a statistically invalid method because the individual percentages are not weighted according to the amount of the related sales. For example, if the tipping rate on a $50 sale is 6 percent, and the rate on a $5 sale is 20 percent, the average tipping rate is not 20% + 6% / 2 = 13%, but is ($5 X 20%) + ($50 X 6%) / $5 + $50 = $4 / $55 = 7.27%. It is readily seen that this weighted average is nothing more than the total amount of tips ($4) divided by the total amount of sales ($55). Hence, it is the method we have used. As noted below, even these corrected percentages probably overstate the gross tipping rate on total sales of the restaurant.↩
2. The parties stipulated to a value of $2,053,465. ↩
3. The parties stipulated to a value of $812,372. ↩
4. Respondent contends that these reductions were erroneous because no charged tips were actually included in computing charged sales.↩
5. As we have found, these amounts were deducted from the waitresses' regular pay checks at $.45 per hour; they did not come out of gross tips although a separate↩ tip to the busboys did. As these amounts were never a part of gross tip income, they should not be added back in determining it. 6. Respondent concedes that this figure should be $3,624.↩